WALSH-KAISER COMPANY, INC. *vs.* JAMES W. YEAGER.

JANUARY 21, 1947.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J.   This is a petition by the employer under the workmen's compensation act, general laws 1938, chapter 300, article III, §13, to review an agreement, made by the parties in accordance with the act, for the payment of compensation to the respondent.   The petition alleges that respondent's incapacity had ended.   Following a hearing in the superior court, the trial justice found that the respondent was no longer incapacitated as a result of the accident covered by the agreement, and a final decree to that effect was thereafter duly entered.   The case is before us on the respondent's appeal from that decree.

It appears in evidence that the respondent was employed at petitioner's shipyard as a rigger and that, on April 21, 1945, while going through an opening in the course of his work, he struck his head against the edge of a steel plate. After receiving first-aid treatment at petitioner's field hospital, his skull was X-rayed on that same day.   The X-ray report was essentially negative.   On June 12, 1945, the parties entered into an agreement for compensation for total incapacity, which agreement was approved by the director of labor.   The petition before us was heard in the superior court on June 25, 1946.   The petitioner has made all payments provided for in the agreement, as they became payable.

The respondent testified that he is now partially incapacitated and that he can do only light work.   He further testified that, since April, 1946, he has been employed at a theater in the city of Providence as cashier or doorman, at wages of $18 and $21, respectively, for a full week's work; and that, since about May, 1946, he has also supervised from eight to twelve ushers and doormen one night a week

at a certain fight arena, for which services he received $2.50 a night.

The basic question for the trial justice to decide was whether, on the evidence before him and the reasonable inferences to be drawn therefrom, respondent's incapacity had ended, and he decided this question in the affirmative. In the absence of fraud, this finding is conclusive on us by force of the act, G. L. 1938, chap. 300, art. III, §6, if there was legal evidence to support the finding.

Our examination of the testimony shows a conflict in the medical evidence. In addition thereto, there was testimony from the respondent and some of his witnesses, especially his wife, that was obviously contradictory, or seemingly improbable, or marked with such a degree of exaggeration as to arouse suspicion of its veracity. The credibility of the witnesses was therefore of vital importance in determining whether the employee had recovered from the incapacity for which he was receiving compensation.

Doctor Ernest A. Burrows, a specialist in neuropsychiatry, and Dr. Henry B. Moor, a surgeon, testified for the petitioner. The former examined the respondent on May 22, 1945, and the latter on September 7, 1945. To each of these doctors the respondent gave a history of the accident and of his physical condition subsequent thereto, which included complaints of dizziness, severe headaches and a "raving spell" at times. The doctors therefore examined him with such history in mind.

There is no need to refer to the medical evidence in detail. Doctor Burrows testified that, but for some lameness in the back, he found no brain or nerve injury. In answer to a question in cross-examination, he further testified that it was not possible for the respondent to have an injury to his brain without positive showing in the tests which he had applied. Doctor Moor testified that he could find nothing the matter with the respondent. He questioned, in the following language, the genuineness of respondent's attack of dizziness while being examined by him: "It did appear

to me at the time that . . . if this man couldn't stand up three or four minutes to be examined, that he was badly off, that he really wasn't able to get by at all and it was hardly safe to come to my office; and I questioned whether or not, in my own mind at the time, that he was as badly off as that."

Doctor Vincent H. Cianci, a general practitioner and respondent's personal doctor, was presented as a witness in his behalf. The sum and substance of Dr. Cianci's lengthy testimony was to the effect that when he last saw the respondent, on April 9, 1946, he was much improved and able to do light work, which he could gradually increase. "His back was better, no marked tenderness, muscle spasm or marked limitation noted." Upon being asked when respondent could resume full use of his body his answer was: "On backs I never can tell. . . . I think that is purely something that the patient himself can determine. . . . It is up to the patient."

Referring to his original diagnosis of traumatic neurosis, Dr. Cianci in cross-examination testified as follows: "Q. And at the present time (June 25, 1946) would you say he had a post-traumatic neurosis? A. I would say that his method of being confused up to the last time I saw him (April 9, 1946), that had improved quite a bit; but he still had some pounding and occasional dizziness *from the symptoms that he gave me,* so that I would say it is not completely cleared up. . . . Q. And the only deviation he has from normal are his subjective complaints of dizziness and some pounding in the head, which you say are much more infrequent and not so bad as when you were treating him? A. Yes, outside of his back. I recommended light work instead of heavy work because I still feel he has not fully recovered." (italics ours)

It also appears in evidence that Dr. Cianci sent the respondent to Dr. Barry Mongillo, a neurologist, who examined him on or about July 26, 1945. The respondent did not call Dr. Mongillo as a witness and excused his nonap-

pearance on the ground that it was "Wednesday and the doctors' day off." Respondent's attorney admitted during the argument before us that the trial justice treated him fairly in the matter and did not preclude him in any way from asking for a continuance to secure Dr. Mongillo's attendance at some later time.

In addition to the medical evidence there was testimony from the respondent and his lay witnesses which furnished a basis for reasonable inferences adverse to him. We will refer briefly to such testimony. Respondent's own testimony is contradictory as to his present physical condition. At one point in his testimony he spoke as follows: "Well, I seem to be getting along pretty fair . . . . But now and then I get a headache and once in a while I get a little dazed." At another point he and his witness, Frank Cirillo, described recent and serious spells of dizziness and pain in the head, lasting from one to two and one half hours, which required him to "sit right straight up in the chair", as he was unable to lie down, and also required him to have ice packs applied to his head.

In the course of his testimony respondent admitted that, following the accident, he had driven either a hearse or a funeral car a number of times for a certain undertaker, and that on one of these occasions he had directed traffic in front of a church to make way for the funeral cortege. He further testified that he was rendering these services without compensation; that the undertaker was trying to "help me out to see if I can't get straightened out of my dizziness"; that there was always a competent driver assigned by the undertaker to sit at his side whenever he acted as driver; and that, although he rendered these services as a favor, the undertaker would give him "a carton of cigarettes or a dollar or two sometimes." This testimony was clearly open to the query whether, in all probability, a reputable undertaker, merely to assist a person whom he knew to be subject to spells of dizziness to recover from such ailment, would place his reputation, the safety of passengers, and valuable property in the hands of such a person.

Certain testimony of respondent's wife was directly contradicted by unimpeachable evidence. She testified in direct examination that she was living with her husband when he was injured; that thereafter he became so irritable that she could not go near him; that because of such condition she left him and filed a petition for divorce; that they were subsequently reconciled; that even now he is so irritable that he does not want anybody to touch him; and that "He goes on for two or three hours, then he goes to sleep and he is all right after a while. But those spells have been coming on and off for the past two or three months now. Last week he had two very bad attacks." We note at this point that there is no evidence that the employee received any medical treatment between April 9, 1946, when Dr. Cianci last saw him, and June 25, 1946, when his wife testified in the superior court.

Upon production of the divorce papers from the files of the superior court and in cross-examination based upon them, it appeared in evidence that the wife petitioned for divorce on the ground of nonsupport on February 21, 1945, or eight weeks and three days before the accident; that the citation in that case was served on March 2, 1945; that she was not living with him when he was injured on April 21, 1945; that in June or July, 1945 she took him back but later she again asked him to leave; that it was only within a month before the hearing of the instant case in the superior court that they were finally reconciled; and that she had not yet personally requested her attorney to discontinue the divorce proceedings.

Questions respecting the credibility of witnesses or the weight of legal evidence are questions of fact and not of law; and, further, a conclusion of the trial justice by way of reasonable inference from legal evidence is a finding of fact. *Parmentier* v. *Moore*, 71 R. I. 369. We have referred to the evidence in some detail in order to emphasize the fact that, in the circumstances of this case, the question of credibility was a very material issue for the trial justice

to determine. His finding of fact must of necessity be based on the probabilities reasonably to be inferred from credible evidence, and especially upon the credence that should be given to the lay testimony for the respondent, since whatever medical evidence he produced depended almost entirely for its conclusions upon the truth of his own assertions. After careful consideration of the conflicting evidence in the record before us, we are of the opinion that there was legal evidence to support the finding of the trial justice and therefore such finding is conclusive upon us under the act.

Respondent's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Henry M. Boss, Francis W. Conlan,* for petitioner.

*Arthur N. Votolato,* for respondent.